IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

J.C., et al.                          :

                                      :

        v.                            :  Civil Action No. DKC 23-2019

                                      :

MONIQUE FELDER, Superintendent        :
  of Montgomery County Public
  Schools, et al.                     :

                                      :

**MEMORANDUM OPINION**

J.C. ("the Student") by and through his parents J.C. and G.C. ("the Father" and "the Mother" or "the Parents") (collectively, "Plaintiffs") brought suit against the superintendent[1] of Montgomery County Public Schools ("MCPS") and the Montgomery County Board of Education (collectively, "Defendants") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Presently pending and ready for resolution are a motion for summary judgment filed by Plaintiffs, (ECF No. 16), and a cross-motion for summary judgment filed by Defendants, (ECF No. 18). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the

---

[1] Plaintiffs named Dr. Monifa B. McKnight as the superintendent of Montgomery County Public Schools. However, Dr. Monifa B. McKnight no longer serves as superintendent and Dr. Monique Felder now serves as interim superintendent. Pursuant to Federal Rule of Civil Procedure 25(d), Dr. Monique Felder is automatically substituted as a party.

following reasons, Plaintiffs' motion for summary judgment will be denied, and Defendants' cross-motion for summary judgment will be granted.

## I.  Background

### A. The Individuals with Disabilities Education Act

The IDEA, 20 U.S.C. §§ 1400 *et seq.*, and its accompanying regulations, 34 C.F.R. §§ 300 *et seq.*, require states that receive federal education funds to make available to each child between the ages of three and twenty-one who has a disability a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A). Maryland also has regulations governing the provision of FAPEs to children with disabilities in accordance with the IDEA.  Md. Code Regs. 13A.05.01.  A FAPE is satisfied if a local education agency[2] provides "specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 201 (1982).  The United States Supreme Court has established a two-part inquiry to analyze whether a local education agency satisfied its obligation to provide a FAPE:

> First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures

---

[2] This opinion uses the term "local education agency" interchangeably with "school district."

2

> reasonably calculated to enable the child to
> receive educational benefits?   If these
> requirements are met, the State has complied
> with the obligations imposed by Congress and
> the courts can require no more.

*Id.* at 206-07.   Thus, to receive relief, a plaintiff must show both that the school district procedurally violated the IDEA and that the defect "had an adverse effect on [the child's] education." *T.B., Sr. ex rel. T.B., Jr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018).

To ensure delivery of a FAPE, local education agencies are required to prepare and implement an appropriate individualized education program ("IEP") for each child determined to have a disability.   20 U.S.C. § 1414(d).   An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" by the child's "IEP Team," which is composed of the child's parents, teachers, a representative of the local education agency, and others.   § 1414(d)(A)-(B).   The IEP must contain statements about the child's current educational performance, the annual goals for the child's education, the special educational services and other aids that will be provided to the child, and the extent to which the child will spend time in school environments with non-disabled children, among other things. § 1414(d)(1)(A).   The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch.*

3

*Dist. RE-1*, 580 U.S. 386, 399 (2017).  Additionally, the child must be educated in the "least restrictive environment," which means that the child must be "educated with children who are not disabled" "[t]o the maximum extent appropriate" and only removed from the "regular educational environment . . . when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  § 1412(a)(5).

The IDEA requires that states establish certain "Procedural Safeguards" that are "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997) (citing § 1415).  These safeguards include a process by which parents can file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  § 1415(b)(6).  Once they have filed a complaint, parents are entitled to an "impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency." § 1415(f)(1)(A).  In Maryland, due process hearings are conducted by an Administrative Law Judge ("ALJ") at the Maryland Office of Administrative Hearings.  *See* Md. Code Ann., Educ. § 8-413; Md.

Code Regs. 13A.05.01.15(C). If parents are dissatisfied with the findings and decision made by the ALJ, they have a right to bring a civil action with respect to their due process complaint in state or federal court. § 1415(i)(2)(A). Under those circumstances, the parents bear the burden of proof both in the administrative hearing and before the state or federal court. *See Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004) ("[P]arents who challenge an IEP have the burden of proof in the administrative hearing."); *Bd. of Educ. of Montgomery Cnty. v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 705 (D.Md. 2000) ("[P]arties aggrieved by the administrative decision may file suit in federal district court, [and] [t]he burden of proof is on the party challenging the administrative decision.").

When a court determines by a preponderance of the evidence that a local education agency has failed to provide a FAPE to a child with a disability, the court is authorized to "grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii). Courts enjoy "broad discretion" in fashioning relief, and "equitable considerations are relevant" in doing so. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985). Reimbursement for private school tuition may be an appropriate form of relief when the child's parents have unilaterally chosen to place the child in a private school after a local education agency failed to make a FAPE available in a

timely manner.  § 1412(a)(10)(C); *see also Burlington*, 471 U.S. at 369–70.  The court may order the state to reimburse the parents for the private school tuition if it determines that the state failed to provide a FAPE and that the private school placement was proper under the IDEA.  *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) (clarifying that this remedy may be appropriate "regardless of whether the child previously received special education or related services through the public school[]").

Plaintiffs argue that the ALJ committed various errors in reaching his decision that the Parents had not met their burden of proving that the proposed IEP failed to offer the Student a FAPE. Plaintiffs seek, in addition to a declaration that Defendants violated their rights, an order requiring Defendants to:  (1) place and fund the Student at his current private school; (2) reimburse the Parents for the tuition, expenses, and costs incurred in enrolling him at the private school for the 2022-2023 school year; and (3) and declare the private school to be his current educational placement.

**B. Factual Background**

Unless otherwise noted, the following facts are drawn from the ALJ's Findings of Fact.[3] (ECF No. 13-1, at 5-24). The relevant facts are not in dispute.

The Student is seventeen years old. (ECF No. 13-1, at 5). He was disenrolled from MCPS and home schooled from the 2017-2018 school year through the 2020-2021 school year. (*Id.*). He has been diagnosed with attention-deficit/hyperactivity disorder (ADHD), learning disorder unspecified, developmental coordination disorder, and mixed receptive expressive language disorder. (*Id.*). He qualifies for special education services as a student with an Other Health Impairment. (*Id.*).

MCPS evaluated the Student for an IEP in April 2018, during which the Woodcock-Johnson IV Tests of Achievement ("WJ-IV") and Wechsler Intelligence Scale for Children—Fifth Edition ("WISC-V") were administered. (*Id.*). The Parents did not accept an IEP from MCPS and the Student remained in home school. (*Id.*). The Parents later requested that MCPS assess the Student for an IEP for the 2021-2022 school year. (*Id.*).

The Learning Center ("TLC") evaluated the Student on August 31 and September 2, 2021 for speech and language needs, during

---

[3] As explained below, there is no evidence that the ALJ's findings were not regularly made. Thus, these findings are prima facie correct. *See Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

which the Clinical Evaluation of Language Fundamentals—Fifth Edition ("CELF-5") was administered. (*Id.* at 6). His score indicated that his overall language ability was below age expectations and it was recommended that he receive speech-language therapy once per week. (*Id.* at 7).

The Student enrolled at Katherine Thomas School ("KTS"), a private school, for the 2021-2022 school year. (*Id.*). KTS developed a Diagnostic Prescriptive Goals and Annotations plan ("DPG") for the Student on December 1, 2021, and the Parents accepted the DPG on December 3, 2021. (*Id.*). The DPG contained Instructional and Testing Accommodations; Present Level of Performance in math, reading, written language, speech and language, and social/emotional; and Goals and Annotations for reading, written language, speech and language, and social emotional/behavioral. (*Id.*). The Instructional and Testing Accommodations in the DPG included small group instruction, extra response time, multiple/frequent breaks, small classroom settings with reduced distractions, and one-to-one assistance. (*Id.*). KTS entered no progress notes for the 2021-2022 school year into the December 2021 DPG. (*Id.* at 8).

On May 17, 2022, an IEP meeting was convened to discuss the Student's IEP status for 2022-2023. (*Id.* at 9). The Parents attended, as did MCPS school psychologist Ms. Harman Kaur ("Ms. Kaur"), and a counselor, attorney, and staff members from MCPS.

(*Id.*).  The parties decided that the Student required psychological and educational assessments to evaluate what supports were necessary for the 2022-2023 school year.  (*Id.*).  On May 19, 2022, the Father authorized an educational assessment.[4]  (*Id.*).

On or about June 2, 2022, KTS drafted a new DPG, but as of the time of the hearing, KTS had not met with the Parents and the DPG was not being used.  (*Id.*).  The December 1, 2021 DPG end date was November 30, 2022, but it was still in force at the time of the hearing in March 2023.  (*Id.*).

On June 14, 2022, the Student completed psychological testing with Ms. Kaur at Magruder High School ("Magruder").  (*Id.*).  Ms. Kaur interviewed the Father and the Student's physics teacher and social worker at KTS.  (*Id.*).  She administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), Connors Third Edition ("Connors-3"), and Multidimensional Anxiety Scale for Children, Second Edition ("MASC-2").  (*Id.*).  The Student told Ms. Kaur that his anxiety and OCD were difficult to manage, he was not doing well, and always had many stressful thoughts.  (*Id.* at 10).  During testing, he engaged in behaviors such as rubbing his arm, burping, tapping his elbow, playing with his ears, and picking his face and nose.  (*Id.*).  He took extended time to complete some assessments.  (*Id.*).  The Student's WAIS-5 scores ranged from

---

[4] The ALJ presumed that the Parents also authorized the psychological assessment although no precise date was provided.

extremely low to average.    (*Id.*).    His IQ was 75, which is considered borderline.    (*Id.*).    The Connors-3, which was administered to the Parents and the Student's history and physics teachers at KTS, indicated concerns with the Student's inattention, learning problems, executive functioning, and peer relations.   (*Id.* at 11).   The MASC-2, which was administered to the Parents and Student, indicated a high probability of an anxiety related disorder, and that the Student suffers from separation anxiety/phobias, performance fears, and obsessions and compulsions consistent with OCD.   (*Id.* at 12).   Ms. Kaur recommended the Student might benefit from the use of checklists, graphic organizers, process charts, or other self-monitoring interventions; regular feedback on his behavior and progress toward meeting classroom expectations; clear and concise instructions and chunking of information into smaller pieces; direct instruction on coping strategies, anxiety management, and mood management techniques; and access to quiet spaces or a cool-down corner with direct instruction of strategies paired with visual guides to support emotional regulation.   (*Id.* at 12-13).

On an undisclosed date, the Student's English teacher at KTS and the Parents were administered the Conners Comprehensive Behavior Rating Scale ("Connors CBRS").   (*Id.* at 10).   The Student's results indicated that he exhibited upsetting thoughts; had problems with learning, understanding, or remembering academic

material; had problems with reading, writing, spelling, communication, and math skills; tended to be rigid and inflexible and engaged in repetitive behaviors; and tended to get stuck on an idea, excessively worry, and have difficulty building friendships. (*Id.* at 11).

MCPS resource teacher for special education Ms. Styliani Perlatti-Cominos[5] ("Ms. Cominos") administered educational assessments on June 14, 16, and 21, 2022. (*Id.* at 13). She relied on the 2021-2022 DPG for the Student's current services, accommodations, and present levels. She did not observe the Student at KTS because of COVID restrictions. (*Id.*). She administered the WJ-IV, which resulted in scores of: low average in basic reading skills, very low in reading fluency, very low in reading comprehension, low in mathematic calculation, low average in math problem-solving, and very low for all written language. (*Id.*). Ms. Cominos recommended that the Student's teachers provide graphic organizers and a proofreading checklist for all written assignments; offer opportunities to practice new mathematical concepts, practice and review writing conventions, and process information before being called upon; encourage the Student to use text to support a thesis; and allow the Student to use a calculator

---

[5] She is usually referred to as Ms. Stella Cominos in the record.

for all mathematical assessments and classwork and extended time for all assessments and long-term assignments. (*Id.* at 15).

The Student did not shut down at either of his June 2022 assessments at Magruder. (*Id.* at 13).

On July 12, 2022, the IEP team met to review the Student's eligibility for an IEP. (*Id.* at 15). The Father, KTS high school education director Mr. Michael Joshua Carpenter ("Mr. Carpenter"), Ms. Cominos, and Enhanced Social Emotional Special Education Services ("E-SESES") resource teacher Ms. Virginia Twombly ("Ms. Twombly") attended, as did the KTS director, KTS support specialist, the Parents' representative, and an administrator, school psychologist, and resource teacher from MCPS. (*Id.* at 15-16). During the meeting, the IEP team considered all the evaluative data, including the recent psychological and educational assessments. (*Id.* at 16). The proposed IEP indicated that the Student's affected areas of disability were academic (math calculation, reading comprehension, speech and language receptive language, written language, content) and behavioral (self-management, social/emotional). (*Id.*). After reviewing the proposed IEP, the Parents made the following requests: addition of a writing goal; addition of reduced workload, visual organizers, and sensory tools to the supplementary aids and services; change the wording to checklist in supplementary aids and services;

addition of a self-advocacy goal; and improved criteria for the speech goal.  (*Id.* at 17).

The proposed IEP set the Student's graduation date as June 16, 2023 and indicated that graduation requirements were explained to the Parents.  (*Id.*).  The Student, however, would not have been able to graduate from Magruder in June 2023.  (*Id.* at 24).  The Student also intends to complete one additional year at KTS.  (*Id.*).

The proposed IEP called for the following instructional and assessment accommodations:  general administration directions clarified, read aloud, and repeated as needed; headphones or noise buffers; redirection; graphic organizer; text to speech; small group; separate or alternative location; frequent breaks; reduction of distractions; notes and outlines; calculation devices and mathematical tools; motor test response; answers recorded in test book; and extended time (2X).  (*Id.* at 17-18).  The proposed IEP included the following supplementary aids, services, program modifications, and supports:  visual organizers, use of word bank, proofreading checklist, frequent and/or immediate feedback, a copy of student/teacher notes, graphic organizers, staff to check for understanding, reduced workload, and a breakdown of assignments.  (*Id.* at 18).  The proposed IEP provided for the following social/emotional supports:  counseling, strategies to initiate and sustain attention, and a daily checklist.  (*Id.*).  The proposed

IEP provided for the following physical/environmental supports: sensory tools; alternative location for the Student to access; and considering the Student's ADHD, inability to focus, and preferred seating close to staff. (*Id.*).

The written language goal in the proposed IEP stated that by August 2023, given adult support, organizers, guiding questions, and grade level curriculum across all content classes, the Student would locate, retrieve, and use information to write text to communicate his ideas and information. (*Id.* at 19). The behavioral self-management goal in the proposed IEP stated that when presented with a problem that caused anxiety, the Student would accurately determine the size of the problem and appropriate emotional response and return to the task at hand in four out of five trials by August 2023. (*Id.*). The speech and language expressive language goal in the proposed IEP stated that the Student would improve expressive language skills by being able to use context clues, write sentences of varied length and complexity, and retell a story by August 2023. (*Id.*).

At the IEP meeting, MCPS, KTS, and the Parents agreed that the Secondary Learning and Academic Disabilities ("LAD") and Social Emotional Special Education Services ("SESES") programs would not meet the Student's needs. (*Id.* at 4 n.12, 20). The LAD program did not have self-contained classes and the SESES program had limited self-contained classes and was designed for students

14

who are aggressive, defiant, elopers, or have a conduct disorder. (*Id.* at 46-47). MCPS instead recommended the E-SESES[6] program for the Student. (*Id.* at 20). MCPS believed the E-SESES program was appropriate for the Student because it was a self-contained program within Magruder that had staff who could work with the Student one-on-one, a social worker to support the Student with his social-emotional needs, and small classes. (*Id.*).

The proposed IEP stated that the Student would receive five hours of instruction outside the general education environment and 50 minutes of instruction inside the general education environment per day. (*Id.*). It also provided for four thirty-minute counseling sessions with the school social worker per month and four twenty-minute sessions of speech/language therapy per month. (*Id.*).

On an undisclosed date, the Parents expressed disagreement with the proposed placement and requested that the file be sent to the Central IEP for a placement determination. (*Id.*). MCPS denied the request. (*Id.*).

On or about August 8, 2022, the Parents notified MCPS that the Student would attend KTS for the 2022-2023 school year. (*Id.*

---

[6] The ALJ referred to the Enhanced Social Emotional Special Education Services program as "ES" to distinguish it from the Social Emotional Special Education Services program. (ECF No. 13-1, at 4 n.12). The court, however, will refer to the Enhanced Social Emotional Special Education Services program as "E-SESES."

at 21).   They requested that MCPS provide funding for the KTS placement.  (*Id.*).   On or about August 25, 2022, MCPS declined to place and fund the Student at KTS.   (*Id.*).

The Parents engaged Dr. Kristen C. Eccleston ("Dr. Eccleston"), director of social emotional services at Weinfeld Education Group, as an educational consultant.  (*Id.* at 4).   Dr. Eccleston helped found the E-SESES program but no longer works for MCPS.  (*Id.* at 38, 57).   On September 15, 2022, the Father and Dr. Eccleston observed the E-SESES program at Magruder.  (*Id.* at 21).   Dr. Eccleston also observed the Student during a social skills group at lunch and in a class at KTS for a total of approximately one hour.  (*Id.*).

On November 4, 2022, the Student was administered the IXL Diagnostic Action Plan Assessment at KTS, which indicated that he performed between a second-grade and ninth-grade level in various academic subjects.  (*Id.* at 23).

At KTS, the Student received final grades of one A, four Bs, and two Cs during the 2022-2023 school year.  (*Id.* at 24).   KTS documented progress comments on January 27, 2023 in the DPG labeled "School Year 2022-2023" and noted that the Student was "making progress" in reading and written language.  (*Id.* at 24).

The Parents cooperated with MCPS during the development of the IEP.  (*Id.*).

**C. Procedural Background**

On October 19, 2022, the Parents, on behalf of the Student, filed a due process complaint with the Office of Administrative Hearings requesting a hearing to review the identification, evaluation, or placement of the Student by MCPS under the IDEA. 20 U.S.C. § 1415(f)(1)(A) (2017); 34 C.F.R. § 300.511(a) (2021); Md. Code Ann., Educ. § 8-413(d)(1) (2022); Code of Maryland Regulations (COMAR) 13A.05.01.15C(1).  On November 9, 2022, the parties held a resolution meeting and agreed in writing that no agreement was possible.  The ALJ held a prehearing conference on November 21, 2022, and held the due process hearing on March 13, 14, and 20, 2023.

The ALJ framed the issues presented to him as follows:

1.  Did MCPS fail to make a free appropriate public education (FAPE) available to the Student for the 2022-2023 school year by failing to develop an IEP specifically related to the amount of special education service hours outside of the general education environment, including an appropriate educational placement or setting for the Student?

2.  If MCPS did not make a FAPE available to the Student for the 2022-2023 school year with an appropriate IEP and placement, was the Parents' placement of the Student at the Katherine Thomas School (KTS) proper/appropriate?

3.  If the placement by the Parents of the Student at KTS is determined to be proper/appropriate for the 2022-2023 school year, should MCPS reimburse the Parents for tuition and related expenses associated with the placement of the

17

> Student at KTS for the 2022-2023 school
> year?

(ECF No. 13-1, at 3).

The ALJ issued his opinion on April 19, 2023.  He concluded that the Parents had failed to prove that:  (1) MCPS did not provide the Student with a FAPE by failing to provide him with an appropriate IEP and placement for the 2022-2023 school year; (2) the Student could not receive a FAPE through MCPS for the 2022-2023 school year and that only KTS would have provided a FAPE; and (3) the Parents are entitled to reimbursement for tuition and expenses at KTS for the 2022-2023 school year.  (ECF No. 13-1, at 65).

Plaintiffs filed a complaint in this court on July 27, 2023. (ECF No. 1).  On the same date, they also filed a consent motion to proceed anonymously and seal the complaint and administrative record, (ECF No. 2), which the court granted on August 24, 2023, (ECF No. 9).  On December 22, 2023, Plaintiffs filed a motion for summary judgment.  (ECF No. 16).  On February 14, 2024, Defendants filed a response and cross-motion for summary judgment.  (ECF No. 18).  Plaintiffs filed an opposition on March 13, 2024, (ECF No. 19), and Defendants replied on April 12, 2024, (ECF No. 22).

## II.  Standard of Review

In IDEA cases, reviewing courts make "a bounded, independent decision"—that is, "'bounded by the administrative record and

additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court.'" *Burke Cnty. Bd. of Educ. v. Denton ex rel. Denton*, 895 F.2d 973, 981 (4th Cir. 1990) (quoting *Town of Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985)).  The United States Court of Appeals for the Fourth Circuit articulated the standard of review for motions for summary judgment in IDEA cases in *M.M. ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523 (4th Cir. 2002):

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving due weight to the underlying administrative proceedings.  In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.  The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities.

*M.M.*, 303 F.3d at 530-31 (internal citations and quotation marks omitted).

After giving due weight to the administrative findings of fact, the reviewing court may conclude "that the evidence considered as a whole pointed to a different legal conclusion than that reached by the [ALJ]."  *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011).

Additionally, pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014); *see also R.S. v. Smith*, No. 20-cv-1300-PX, 2021 WL 3633961, at *7 (D.Md. Aug. 17, 2021). A reviewing court, however, cannot "'reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility.'" *Doyle,* 953 F.2d at 104 (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976)).

The general standards of review for summary judgment motions also apply:  The moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  In determining whether a moving party has made that showing, a court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Where, as here, cross-motions for summary judgment have been filed, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration[.]" *Bollech v. Charles Cnty., Md.,* 69 F.App'x 178, 180 (4th Cir. 2003) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)).

## III. Analysis

### A. Presumption of Correctness

When reviewing state administrative decisions in an IDEA case, the court must first determine whether the ALJ's findings of fact are entitled to a presumption of correctness. Such a presumption is appropriate if the findings of fact are made "'in a regular manner and with evidentiary support[.]'" *A.H. v. Smith*, 367 F.Supp.3d 387, 411 (D.Md. 2019) (quoting *Doyle*, 953 F.2d at 105). "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" *Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005) (quoting *Doyle*, 953 F.2d at 104). The Fourth Circuit has found a process to fall within the accepted norm when

> the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.

*J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008).

Here, Plaintiffs do not argue that the ALJ's findings were not regularly made.[7]  Indeed, the ALJ conducted a proper hearing, allowed the Parents and MCPS to present evidence and make arguments, and resolved the factual questions in the normal way. *J.P.*, 516 F.3d at 259.  The ALJ's 64-page opinion is "well-reasoned and supported by the record."  *SE.H. v. Bd. of Educ. of Anne Arundel Cnty. Pub. Sch.*, 647 F.App'x 242, 248 (4th Cir. 2016). "The ALJ heard testimony from numerous witnesses over [three] days and clearly reviewed" the documents submitted as evidence.  *Id.* The opinion summarizes and cites to the witnesses' testimony and includes the relevant legal standards, the ALJ's findings of facts, and legal conclusions.  *J.P.*, 516 F.3d at 262; *Henrico Cnty.*, 399 F.3d at 305.  Because the proceedings were not "far from the accepted norm," the ALJ's findings of fact are entitled to a presumption of correctness.  *J.P.*, 516 F.3d at 259.

**B. Provision of a Free Appropriate Public Education**

Plaintiffs contend that the ALJ committed various errors in finding that the proposed IEP provided an appropriate placement for the Student.  Specifically, they argue the ALJ: (1) failed to consider the clear harmful effects of moving the Student out of his beneficial placement at KTS; (2) relied on an outdated FAPE

---

[7]  Plaintiffs do challenge the ALJ's decision to grant deference to the opinions of MCPS's witnesses, (ECF No. 16-1, at 12), which will be addressed below.

standard in reaching his decision; (3) deferred to the MCPS witnesses' opinions as to the appropriateness of the proposed IEP and placement when they did not apply their expertise to the Student's education; (4) concluded that the E-SESES program was appropriate for the Student given his unique needs; (5) considered services not actually proposed in the IEP and failed to recognize that MCPS could not have implemented the IEP; and (6) suggested the Parents acted with anything but good faith in their interactions with MCPS.

### 1. Whether the ALJ Erred by Failing to Consider the Harmful Effects of Moving the Student out of His Placement

Plaintiffs argue that the ALJ failed to consider the harmful effects of moving the Student out of KTS during his senior year. (ECF No. 16-1, at 7). They assert that the ALJ ignored testimony from the Mother, Mr. Carpenter, and Dr. Eccleston that the Student struggles to adjust to changes and that transitioning him to Magruder during his senior year would cause him to shut down. (*Id.* at 7-8). They also contend the ALJ failed to consider relevant authorities holding that it would be inappropriate to require students to move programs. (*Id.* at 8-9) (citing *Holmes v. D.C.*, 680 F.Supp. 40 (D.D.C. 1988); *Leggett v. D.C.*, 793 F.3d 59 (D.C. Cir. 2015); *Burger v. Murray Cnty. Sch. Dist.*, 612 F.Supp. 434 (N.D.Ga. 1984)). Finally, Plaintiffs maintain that the ALJ failed

to consider the harmful effects that not being able to graduate in 2023 would have on the Student. (*Id.* at 10).

Defendants argue that the ALJ "directly addressed" the Parents' witnesses' concerns about the Student's potential move to Magruder and "simply found the concerns to not be a convincing reason to find that the IEP did not provide the Student a FAPE." (ECF No. 18-1, at 26). Defendants assert that the ALJ found that the Student would not shut down at Magruder because he attended his assessments there without shutting down, transitioned from homeschooling to KTS without shutting down, had peers outside of KTS, and made progress on social skills since entering KTS, and because E-SESES had the supports to address a potential shut down. (*Id.*).

None of Plaintiffs' cases are apposite. In *Holmes*, the student was in his last semester of school, the school district had not shown why its proposed program was appropriate because it was in its "start-up period[,]" and the school district committed several procedural mistakes including failing to submit a timely IEP. *Holmes*, 680 F.Supp. at 42. Here, however, the E-SESES program is well-established, the Student would have spent his whole senior year at Magruder, and there is no indication that Defendants committed any "egregious procedural" errors. *Id.*

In *Leggett*, the court held that placement in a private school was appropriate where the school district was unresponsive to the

plaintiff's communications and had no IEP in place when the school year began. *Leggett*, 793 F.3d at 66, 69, 72. The court declined to determine whether the student should return to the public school for the second semester of the year because it did not know whether the IEP was adequate, whether returning to the public school would have unduly disrupted the student's education, and whether her tuition and fees were refundable mid-year. *Id.* at 74. The court did not rule that a mid-year transfer that disrupted the student's education would require a continued private placement. Moreover, here the transfer would not have been mid-year.

In *Burger*, the court held that when a student's current placement in a private school "has been deemed to be an appropriate setting," the party seeking to move the placement to a new facility "bear[s] the burden of proving its propriety." *Burger*, 612 F.Supp. at 437. Here, however, the ALJ—and, as will be explained, the court—have deemed Magruder to be the appropriate placement. Thus, the Parents bear the burden of proof to "change the status quo." *Id.* at 436.

More importantly, the ALJ did consider the potential harmful effects of moving the Student out of KTS for his senior year. He considered the testimony of the Parents' witnesses, acknowledging that they "believed the Student would 'shut down' if he were transferred from KTS to Magruder in his senior year of high school." (ECF No. 13-1, at 56). He concluded, however, that

25

"[t]he credible evidence . . . is that the Student would probably not shut down at Magruder[]" because he:  (1) "did not shut down when he went to Magruder for assessment"; (2) "was sociable with both KTS peers and friends of his KTS peers[]"; (3) "was reticent to attend KTS from his home school environment but did so" and adjusted well; (4) "has made progress in his social skills since he entered KTS"; (5) "demonstrated flexibility and a willingness to engage with peers and developed positive peer relationships at KTS despite being new[]"; (6) and "did not 'shut down' when he transferred from home school to KTS."  (*Id.* at 56, 61-62).  The ALJ determined that the E-SESES program "could have built upon the progress made by the Student since his attendance at KTS."  (*Id.* at 61).  Indeed, he credited the testimony of Ms. Twombly "who stated that a 'shut down' reaction would be a call for more coping strategies and a meeting of the IEP team to consider additional supports."  (*Id.* at 62).

The ALJ also considered the effect that not being able to graduate in 2023 could have had on the Student.  (*Id.*).  He found the effect minimal because the Parents had already decided the Student would complete an extra year at KTS.  (*Id.* at 63).

This court will not second-guess the ALJ's decision that MCPS's witnesses, who testified that the transfer would benefit the Student, were more credible than the Parents' witnesses. *Doyle,* 953 F.2d at 104.  Plaintiffs have not proven that the ALJ

erred by failing to consider the harmful effects of moving the Student out of KTS during his senior year.

## 2. **Whether the ALJ Erred by Relying on an Outdated FAPE Standard**

Plaintiffs argue that the ALJ's decision should be overturned because he failed to apply the standard for a FAPE outlined in *Endrew F.*, and instead relied on the outdated "basic floor of opportunity" standard. (ECF No. 16-1, at 10-11) (citing ECF No. 13-1, at 63). Defendants contend that the ALJ correctly applied the *Endrew F.* standard and used the "basic floor of opportunity" language only when summarizing his findings, not when determining whether the proposed IEP was appropriate. (ECF No. 18-1, at 25-26).

Defendants are correct. The ALJ noted that the *Endrew F.* court changed the definition of a FAPE to mean that "a school must offer an IEP reasonably calculated to enable a student to make progress appropriate in light of the student's circumstances." (ECF No. 13-1, at 27). The court applied that definition, finding that Defendants "developed a reasonable and appropriate IEP for the Student for the 2022-2023 year in the appropriate educational environment." (*Id.* at 63). He determined that the proposed IEP was reasonably calculated to enable the Student to progress in light of his circumstances because "the Student's needs could be met in the [E-SESES program] at Magruder." (*Id.* at 57, 63). As

27

Defendants argue, the ALJ only used the "basic floor of opportunity" phrase when summarizing his findings and explaining his decision to defer to the educators' decisions. (*Id.* at 63). Plaintiffs have not proven that the ALJ erred by failing to apply the *Endrew F.* standard when evaluating whether Defendants provided the Student a FAPE.

### 3. Whether the ALJ Erred by Deferring to the MCPS Witnesses' Opinions When They Did Not Apply Their Expertise to the Student's Education

Plaintiffs argue that the ALJ should not have deferred to the opinions of MCPS's witnesses because they had "little to no knowledge" of the Student and therefore they did not apply their expertise to the Student's individual needs. (ECF No. 16-1, at 12, 14-15). Specifically, Plaintiffs contend that only two of MCPS's three witnesses had any in-person knowledge of the Student, and their combined knowledge of him was only a few hours in a one-to-one testing environment. (*Id.* at 13). In contrast, Plaintiffs assert that the Parents' witnesses testified based on both their professional expertise and their knowledge of the Student. (*Id.* at 15-16). As a result, Plaintiffs maintain that the Parents' witnesses, not MCPS's witnesses, were entitled to controlling deference. (*Id.* at 16). Defendants argue that the ALJ afforded more weight to the opinions of MCPS's witnesses because he found the Parents' witnesses less informed and less persuasive. (ECF No. 18-1, at 26).

As Defendants assert, the ALJ explained why he deferred to the opinions of MCPS's witnesses.  He stated that "[t]he Parents' witnesses also testified credibly but appeared less informed. Their opinions were less persuasive." (ECF No. 13-1, at 57).  He noted that Mr. Carpenter never formally or informally observed the Student, never taught the Student, and had only worked at KTS for one month, and that Dr. Eccleston did not attend any IEP meetings and spent only an hour with the Student.  (*Id.* at 57-58).  In contrast, he found that MCPS's "experts spent several hours over the course of three days with the Student at Magruder." (*Id.* at 58).  He acknowledged that MCPS's witnesses did not observe the Student at KTS, but found that they "evaluated all the information sent to them by KTS and interviewed some of the Student's teachers and a counselor, as well as the Parents." (*Id.*).  The ALJ also credited Ms. Twombly's knowledge of E-SESES over that of Dr. Eccleston because although Dr. Eccleston helped create the program, Ms. Twombly presently runs it, and it has changed since Dr. Eccleston left.  (*Id.* at 59).

Furthermore, a thorough review of the record shows that MCPS's witnesses applied their knowledge of the Student when evaluating his needs.  Ms. Cominos testified that she conducted an educational assessment over the course of three days with the Student, (ECF No. 13-1, at 669-70), made recommendations based on her assessment at the IEP meeting, (*id.* at 681), and believes the E-SESES program

29

"can provide everything he needs[,]" (*id.* at 686).  Ms. Kaur
testified that she conducted a psychological assessment with the
Student, (*id.* at 716), reviewed his school and medical records,
(*id.* at 720), communicated with the Father and two of the Student's
KTS teachers, (*id.* at 722-23, 733), and that another psychologist
discussed her findings at the IEP meeting when she was on maternity
leave, (*id.* at 738).  She also testified that based on what she
knows about the Student and the E-SESES program, the Student "seems
like he would be a great fit.  It seems like he would be able to
be serviced appropriately there and that he would have his needs
met." (*Id.* at 739).  Ms. Twombly testified that although she never
met the Student, she arrived at her conclusion that E-SESES would
be an appropriate placement after reviewing his educational
evaluation, psychological evaluation, and information from KTS,
and attending two of the Student's IEP meetings. (*Id.* at 800-01).

Thus, MCPS's witnesses applied their expertise to the
Student's unique circumstances.  The court must "'afford great
deference to the judgment of education professionals in
implementing the IDEA,' because the IDEA does not allow federal
courts 'to substitute their own notions of sound educational
policy' for those of local school authorities[.]" *O.S. v. Fairfax
Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015), *abrogated on
other grounds by R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919
F.3d 237 (4th Cir. 2019) (quoting *A.B. ex rel. D.B. v. Lawson*, 354

F.3d 315, 328 (4ᵗʰ Cir. 2004)) (internal citation omitted).  Even if the court could reverse the ALJ on the question of credibility—which it cannot—it would not be appropriate to do so here.  The ALJ reasonably concluded that "[b]ased on the evidence before me, I do not find, as the Parents argued, that MCPS failed to exercise its expertise in development of the IEP."  (ECF No. 13-1, at 58).  Plaintiffs have not demonstrated that the ALJ erred in deferring to MCPS's witnesses' opinions as to the appropriateness of the IEP and placement at Magruder.

### 4. Whether the ALJ Erred by Concluding the E-SESES Program Was Appropriate for the Student Given His Unique Needs

Plaintiffs contend that the ALJ erroneously concluded that E-SESES program was appropriate for the Student and failed to address Plaintiffs' concerns about its appropriateness.  (ECF No. 16-1, at 16, 20).  Plaintiffs argue the E-SESES program is inappropriate because the Student's cognitive scores are lower than those of the other students in E-SESES; the Student's primary need is academic and his social/emotional needs are secondary, while E-SESES was designed for students with primarily social/emotional needs; the Student would have been the only student receiving speech/language services in E-SESES; the Student would not have an appropriate peer group with which to develop his speech/language skills; and E-SESES does not provide social pragmatic support.  (*Id.* at 17-19).

Defendants assert that the ALJ appropriately found that the services described in the proposed IEP provided the Student with a FAPE because the E-SESES program could implement the IEP and provide the Student with opportunities to interact with typically developing peers. (ECF No. 18-1, at 25). Defendants contend the proposed IEP provides supplementary aids, accommodations, goals, and services designed to address the Student's academic and social/emotional needs. (ECF No. 18-1, at 20). They argue that the MCPS witnesses "offered cogent and responsive explanations for why they decided that the IEP service and placement recommendations were appropriate for J.C. and provided him with a FAPE." (*Id.* at 20). Specifically, MCPS's witnesses testified that E-SESES can provide the Student with everything he needs, including small classrooms, one-on-one support, a social worker, a social skills class, exposure to a general education setting, and support to increase coping skills. (*Id.* at 20-22). Defendants argue that there is no cognitive prerequisite for students to participate in the E-SESES program and that the program is designed to meet students where they are. (*Id.* at 23). Defendants maintain that the evidence is clear that the Student's primary needs are emotional, not academic. (*Id.* at 24). Finally, Defendants assert that E-SESES is familiar with providing speech/language services to students in past years. (*Id.*).

The ALJ considered the Parents' witnesses' testimony that E-SESES would be inappropriate for the Student, and simply found that other evidence outweighed it.  He considered Dr. Eccleston's testimony that E-SESES would be inappropriate because: (1) "the Student's feelings of being challenged of different would be exacerbated if he were around other students who were smarter than he[]"; (2) the program "would require the Student to navigate a 'comprehensive' building to attend any electives[]"; (3) "the Student would be socially and academically below his age group"; (4) the Student would "struggle with the transition from KTS to Magruder[]"; (5) the Student "would not be able to find a peer group with whom he could relate[]"; (6) "the Student required social and emotional support but secondary to academics and, therefore, he is on the same cognitive level as his peers at KTS, and that would not be the case at Magruder[]"; and (7) the "general education class . . . provid[es] only a paraeducator and not a special education teacher."   (ECF No. 13-1, at 59-60).

In spite of these considerations, the ALJ found E-SESES appropriate for the Student because:   (1) "the more credible testimony at the hearing indicated that the students in the [E-SESES program] would be welcoming to the Student[]"; (2) "the Student would receive one-to-one instruction[]"; (3) the program provides opportunities to "address the Student's social and emotional needs outside of the classroom and in preparation for

33

the outside world" including access to an outdoor property, cooking, handicrafts, and a greenhouse, which "allow students to hone social interaction skills[]"; (4) "the one thing all the students in [E-SESES] have in common is that they have social emotional anxiety"; (5) the Student's cognitive scores fit the profile of the students in the program because "it was not uncommon to have students in [E-SESES] who function at a third, fourth, or fifth grade level in particular subjects[]"; (6) the program has "less than forty students and ample opportunity for self-contained classes while, as required under the IDEA, delivering instruction in the [least restrictive environment]"; (7) "if the Student was unable to successfully participate in the general education environment for the one elective (most likely an art class) the IEP team would meet and discuss revisions to the IEP[]"; and (8) the program is "a school within a school" and is "locked only to general education student[s] coming in, not [E-SESES] students going out."  (ECF No. 13-1, at 59-60).

The record supports the ALJ's conclusion.  Ms. Cominos testified that E-SESES is an appropriate placement for the Student because it:

> can provide everything that he needs.  They have the small classrooms, they have the one on one support, they have a social worker on staff, they can meet the student where they are.
>
> . . . .

34

> [T]hey are able to provide him with supports
> through a social worker.  They have the human
> behavior class which is social skills class.
> They do a lot of activities where [the
> Student] would be exposed to students forming
> friendships, completing tasks together.  [The
> Student] would also have the opportunity to be
> exposed to the same age peers in a regular
> class if he was ready for a mainstream class.
> So not only—it's not a locked facility where
> the students are not exposed to the same age
> peers that are at Magruder High School.  When
> they are ready they are able to provide that
> level of support also to support them out in
> the mainstream to take classes.
>
> .  .  .  .
>
> [KTS] talked about that [the Student] needs
> social skill instruction.  That [is] part of
> the enhanced program.  They talked about that
> [the Student] meets with a social worker[.]
> [T]hat is part of their program.  They talked
> about being able to have small classroom.
> That is something that the enhanced program
> has.  They talked about if [the Student]
> needed some one on one support.  They have
> that.  They have the staffing and they have
> the classes that they can offer him all of
> those things that he needs.

(ECF No. 13-1, at 686-88).

Ms. Kaur explained why she believed E-SESES would be
appropriate for the Student:

> I think initially it's difficult to think
> about how that program can service all of his
> needs, but after being immersed in that
> program myself and servicing that program as
> well as conducting psychological assessments
> for other students in that program [the
> Student] seems like he would be a great fit.
> It seems like he would be able to be serviced

35

appropriately there and that he would have his
needs met.

. . . .

I think there is a great peer group person
there.  In fact some of the students I am
pulling for—I'm waiting for permission slips
to pull them for my social skills group, so
that they have some positive role models there
as well from some of those general education
positive role model peers.  There are other
social skills trainings throughout the day
that I think [the Student] would really,
really benefit from.  There are lots of
special projects that are done.  Things like
communicating with one another to plant things
in the greenhouse and communicating with one
another when they do trips out in the
community such as to Kingsley or to Pope Farm.
Making sure that some of those skills are
really honed and there are consistently and
constantly adult around that kind of help
support some of those social skills
development but also like that honing of those
social skills when there are things like
conflict or questions or just the need to
interact.  I also think that some of those
very small ratios of support would be really
beneficial for him.  The number of peers to
staff is—that ratio is quite small there and
he would be able to access a lot of that
redirection that I think [the Student] really
needs from some of that internal distraction
that he has.  I think that the engagement and
the facilitation of the staff in that program
would be really beneficial for him throughout
the day.  And just speaking from my personal
experience and observation the staff up there
is very patient and gentle and very well
trained to work—and accustomed to working with
students that have significant anxiety
difficulties.

. . .

[H]e would have access to a social worker.
The social worker meets with students
regularly.  He would be able to have that not
only the services that are documented in his
IEP but he would have access to the social
worker along with the social worker interns
all day long.  He would have access to other
adults that are able to facilitate some of
those de-escalation strategies and able to
facilitate some implementation of skills that
support the reduction of anxiety.  He would
have the ability to interact with peers that
are dealing with very similar difficulties.
And he would have access to things like the
mindfulness room and spaces like that when he
needs to take a break.

. . . .

[The psychological reason to try E-SESES in
the Student's senior year is that] I think he
really does need that support with his anxiety
disorder and with his obsessive/compulsive
disorder.  I'm not sure [the Student] has an
outside therapist.  That ability to work with
a mental health professional to address some
of those anxiety needs as mentioned by folks
like [the Student's] parents and individuals
at Katherine Thomas along with my own
observations of [the Student] himself I think
indicate that he really would benefit from
mental health support.

. . . .

[F]rom what I heard at KTS it doesn't sound
like he has the same level of emotional
support.  It sounds like there is a social
worker that he meets with, but I don't know
that the social worker is available to him the
way that we have folks available at the
enhanced program.

(ECF No. 13-1, at 739-42, 749, 752).

Ms. Twombly addressed the Parents' witnesses' concern that the Student's cognitive scores were lower than those of the other E-SESES students, stating that the cognitive skills of the students:

> absolutely run[] the gamut. While it is true that many of the students—I would probably say more than half of the students are at or—or above or even well above average full scale IQ, we also have some that are below[.]

(ECF No. 13-1, at 814).   She also explained that E-SESES is designed to meet students where they are:

> If they are pursuing a diploma, then we're working with them.
>
> . . . .
>
> If they have been successful in credit bearing classes and they're diploma bound, the fact that they may have deficits in a particular area, I work with those kids all the time.  We always have kids that have deficits, generally because of missed instruction but for whatever reason.
>
> [The Student] is a diploma bound student that has had As, Bs, and Cs in challenging classes. So, no, I thought the bigger issue was the psychological record of considerable anxiety, major attention issues, OCD, all of the social/emotional problems I thought would be the number one issue that were impacting his ability to access his academics.
>
> . . . .
>
> The teachers are special education teachers and they are trained to provide specialized instruction and, as you say, many of our students come with academic deficits in various areas, as well as social/emotional.

38

> . . . .

> [T]he teachers provide[] differentiated
> instruction to meet each individual student's
> need.

(ECF No. 13-1, at 818, 826-28).  Although the Student's cognitive
scores would be at the low end of the range amongst E-SESES
students, the evidence indicates that he fits the program's
profile.

The evidence also reflects that the ALJ reasonably determined
the Student's primary needs are social/emotional, not academic.
The psychological evaluation indicates a high probability that the
Student has an anxiety disorder and that the Student exhibits signs
of obsessive compulsive disorder.  (ECF No. 13-1, at 116-17, 124).
Ms. Kaur testified that the Father

> reported that his greatest concerns were about
> Joseph's obsessive/compulsive order
> diagnosis.  And the impact that it might have
> on his ability to graduate.  He stated that
> his concerns began with that panic attack I
> had mentioned.  And he referred to it as a
> several [sic, severe] anxiety attack that
> happened in September of 2018.  He added that
> his mood is not typically very good because of
> [the Student's] constant stress and anxiety.
> He also indicated that [the Student] had some
> behaviors that appeared odd such as fumbling
> with his ears and rubbing his hands.

> . . . .

> At that time I did not hear any academic
> concerns really.  I really was only told about
> the social emotional needs.  Specifically that
> anxiety and stress.

(ECF No. 13-1, at 723).  Although the evidence indicates that the Student also has significant academic needs, the ALJ's decision that Defendants' witnesses testified more credibly as to the Student's primary need is supported by the evidence.  *Doyle,* 953 F.2d at 104.

The evidence also reflects that although the Student would be the only E-SESES student receiving speech/language services, the program has had students receiving these services in the past and could meet the Student's speech/language needs.  (ECF No. 13-1, at 824).

The evidence indicates that the Student would have had an appropriate peer group in E-SESES.  Ms. Twombly testified that E-SESES students have a wide range of disabilities but they all "have in common that . . . their social/emotional, their anxiety, their concerns . . . affect them."  (ECF No. 13-1, at 804).  She noted that like the Student, E-SESES students also have co-diagnoses, struggle with academics, have a hard time with transitions, and "shut down" as a coping mechanism.  (*Id.* at 804, 814-15, 819-21).

Finally, although Plaintiffs argue E-SESES does not integrate social pragmatic support throughout the day as does KTS, (ECF No. 16-1, at 19), Ms. Kaur and Ms. Twombly testified that E-SESES provides ample social skills training through modeling social interactions, a social skills counseling group with peer role

models, instruction on coping mechanisms, routines to learn
sharing and turn taking, and opportunities to practice social
skills in settings such as an environmental center, a course
entitled "human behavior," and a greenhouse. (ECF No. 13-1, at
714, 809-10, 821-22).

Based on a careful review of the record, the ALJ reasonably
determined that E-SESES could meet the Student's "unique needs."
*Endrew F.*, 580 U.S. at 402. Thus, Plaintiffs have not proven that
the ALJ erred in concluding the E-SESES program at Magruder was an
appropriate placement for the Student.

5. **Whether the ALJ Erred by Considering Services Not Proposed
in the IEP and Failing to Recognize That MCPS Could Not
Have Implemented the IEP**

Plaintiffs contend that the ALJ erred in failing to recognize
the importance of the fact that Defendants could not implement the
proposed IEP because the Student would not have graduated in 2023
as the IEP specified. Plaintiffs argue that the ALJ should not
have found that the Parents did not consider whether the Student
would graduate in their decision making process about whether to
send the Student to Magruder because the first time they learned
the Student would not be able to graduate in 2023 was during the
due process hearing. (ECF No. 16-1, at 20-21). Plaintiffs also
contend the ALJ erred in considering information about services
available to the Student not called for in his proposed IEP,

including the addition of more supports in or withdrawing from the Student's general education class. (ECF No. 16-1, at 22).

Defendants argue that the graduation date on the proposed IEP is not relevant to whether it provided the Student with a FAPE and that the ALJ correctly noted that an IEP is prospective. (ECF No. 18-1, at 27). Defendants also assert that the ALJ did not consider services not listed on the proposed IEP in determining whether it would provide a FAPE; rather, they assert, he referenced the potential services when discussing the Parents' concerns regarding a transfer from KTS to Magruder. (*Id.* at 25).

Defendants are correct. Factually, the ALJ found that the incorrect graduation date on the proposed IEP did not affect the Parents' decision not to enroll the Student in Magruder because they were not aware of the error. (ECF No. 13-1, at 62-63). Even if the error constituted a procedural IDEA violation, it would not have resulted in substantive educational harm because the Parents had already decided the Student would spend an extra year at KTS. Moreover, IEPs are prospective and are not treated as legally binding contracts. *John A. v. Bd. of Educ. for Howard Cnty.*, 400 Md. 363, 385 (2007). Plaintiffs have not demonstrated that the Student's inability to graduate on the date provided in the proposed IEP constitutes a violation of the IDEA. *See, e.g.*, *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205-06 (2d Cir. 2007) (noting that an inability to graduate on the

student's anticipated graduation date does not necessarily result in an IDEA violation).  The IDEA "cannot and does not promise 'any particular [educational] outcome.'"  *Endrew F.*, 580 U.S. at 398 (quoting *Rowley*, 458 U.S. at 192).

Additionally, the ALJ did not consider the possibilities to add more supports in or withdraw from the general education class as necessary to the provision of a FAPE.  (ECF No. 16-1, at 22).  Ms. Twombly testified that if these changes were necessary, the IEP could be amended, (ECF No. 13-1, at 843-44), and the ALJ only referenced the possible changes while discussing the Parents' concern that the Student is not on the same cognitive level as the E-SESES students, (*id.* at 60).

Plaintiffs have not proven that the ALJ erred by failing to conclude that the proposed IEP could not be implemented due to an incorrect graduation date or by considering services not in the IEP.

### 6. Whether the ALJ Erred by Suggesting the Parents Acted in Bad Faith

Plaintiffs assert that the ALJ erred in suggesting the Parents acted with anything but good faith because they never considered Magruder.  (ECF No. 23).  Plaintiffs maintain that the Parents fully cooperated with the IEP process, observed and consulted with Dr. Eccleston to learn more about the program, and ultimately ruled

it out.  (*Id.* at 23-25).  They ask the court not to accept any suggestion that the Parents engaged in bad faith.  (*Id.* at 25).

Defendants argue that the Parents did not have any intention of accepting what was proposed by MCPS and only cooperated with the IEP process to seek funding for KTS at a later time.  (ECF No. 18-1, at 30).  They add that the ALJ's description of the Parents' cooperation was not in response to any argument about bad faith, but rather to frame the Parents' concern for potentially transitioning the Student from KTS to Magruder.  (*Id.*).

Indeed, the ALJ noted that MCPS did not dispute that the Parents cooperated with the IEP process.  (ECF No. 13-1, at 60). He only remarked that the Mother testified she never considered Magruder when discussing the Parents' concern that the Student would shut down at Magruder.  (*Id.* at 60-61).  He explicitly found that the Parents cooperated with MCPS during the development of the IEP.  (*Id.* at 24).  Because the ALJ did not find the Parents engaged in bad faith, there is no need to discuss whether the ALJ erred in suggesting otherwise.

In sum, Plaintiffs have not proven that the ALJ erred in finding the proposed IEP provided the Student with a FAPE and that the E-SESES program at Magruder was an appropriate placement. Defendants, however, have demonstrated that the ALJ did not err in reaching his conclusion.  The record reflects that the E-SESES program would have enabled the Student "to make progress

44

appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S. at 399.

### C. Request for Reimbursement

Plaintiffs seek reimbursement for the Student's tuition, expenses, and fees at KTS.  (ECF No. 16-1, at 26-27).  To obtain court-ordered reimbursement for the Student's private education, a plaintiff must demonstrate that the defendant failed to provide a FAPE and that the private education is appropriate to meet the child's needs.  *Carter*, 510 U.S. at 15.  Because the court has determined that the ALJ did not err in finding Defendants provided the Student with a FAPE, the court need not analyze whether KTS is an appropriate placement for the Student or whether reimbursement is proper.

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment will be denied and Defendants' cross-motion for summary judgment will be granted.  A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge